DECISION
{¶ 1} Relator, Reitter Stucco, Inc., filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order, which granted an award of temporary total disability ("TTD") compensation to respondent, Tony A. Mayle ("claimant"), and ordering the commission to find that claimant is not entitled to that compensation.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) No party has objected to the magistrate's findings of fact, and we adopt them as our own, except that we change the reference to "Frank" Reitter in Findings of Fact Nos. 35 and 39 to "Fritz" Reitter.
 {¶ 3} Briefly, claimant sustained a work-related injury to his back in August 2003. Since then, as the magistrate's findings of fact indicate, claimant has undergone numerous medical treatments, including surgery.
 {¶ 4} At issue here are statements by claimant reflected in reports relating to his medical treatment. As detailed by the magistrate, these reports reflect claimant's "homicidal ideation" against relator and his desire to hurt his supervisors as "'pay back to them[.]'"
 {¶ 5} On April 11, 2005, claimant met with relator's president, Fritz Reitter. At the meeting, claimant admitted that he had made threatening statements related to his employer. Relator terminated claimant's employment on April 15, 2005.
 {¶ 6} On April 26, 2005, claimant requested TTD compensation. In support, claimant offered the opinion of Dr. Wayne J. Cummings, who indicated that claimant was unable to return to his former position or to any other employment at that time.
 {¶ 7} Following a hearing on June 7, 2005, a district hearing officer ("DHO") denied claimant's motion. The DHO concluded that, because claimant's threats against his employer violated a written work rule against such threats, claimant had voluntarily abandoned his employment with relator.
 {¶ 8} On appeal, and following a hearing on August 11, 2005, a staff hearing officer ("SHO") vacated the DHO's order and granted claimant's request for TTD compensation. The SHO concluded that "the injured worker was not capable of working and was on temporary total disability compensation when the inflammatory comments were made." Therefore, the voluntary abandonment principles under State ex rel. Louisiana-PacificCorp. v. Indus. Comm. (1995), 72 Ohio St.3d 401, did not apply.
 {¶ 9} On appeal, the full commission affirmed the SHO's order. Upon review of the evidence, the commission rejected relator's opposition for two reasons: (1) claimant did not have the physical capacity for employment at the time of his alleged abandonment; and (2) relator had informed claimant, prior to his threatening statements, that relator had no positions available for him. In short, claimant "could not have abandoned a job that he did not have."
 {¶ 10} As noted, relator sought a writ of mandamus from this court, and the magistrate has recommended a denial. The magistrate agreed with the commission that claimant was not capable of returning to his former position at the time he made the statements. The magistrate also declined to create an exception to State ex rel. Brown v. Indus.Comm. (1993), 68 Ohio St.3d 45, and State ex rel. Pretty Products, Inc.v. Indus. Comm. (1996), 77 Ohio St.3d 5, so as to preclude compensation.
 {¶ 11} Relator raises two objections to the magistrate's decision. We begin with relator's second objection.
 {¶ 12} In its second objection, relator argues that the magistrate erred in concluding that this case does not present an exception toBrown and Pretty Products. As the magistrate concluded, underBrown and Pretty Products, a claimant who is not capable of returning to his former position cannot voluntarily abandon that position. In relator's view, however, claimant's threat to kill his employer, made at a time when claimant professed his willingness and ability to return to work, should preclude his receipt of TTD compensation.
 {¶ 13} We acknowledge the serious nature of claimant's threats. Nevertheless, we agree with the magistrate that current law does not allow the exception relator seeks. Instead, under current law, because claimant was unable to return to his former position — an inability, as the commission fo und, apparent from the medical evidence — claimant could not voluntarily abandon his position at the time he made the threats. Therefore, we overrule relator's second objection.
 {¶ 14} After concluding that the commission had properly appliedBrown and Pretty Products, the magistrate went on to conclude that, even if an exception were appropriate under certain circumstances, relator's written work rules did not clearly provide for termination for threatening statements made to third parties. In its first objection, relator objects to this conclusion. Upon review, we find that the magistrate's discussion of relator's writtenwork rules was unnecessary to a complete resolution of the matter before us. Therefore, we do not adopt, and we delete from the magistrate's opinion, the discussion at ¶ 70-73, beginning with: "Even if an exception should be made"; and ending with the sentence: "It is not clear, by the written work rules, that an employee could be terminated for making a statement to a third party during the course of therapy." Having made this deletion from the magistrate's conclusions of law, we find that relator's first objection is now moot.
 {¶ 15} In summary, we find that relator's first objection is moot, and we overrule relator's second objection. Finding no other error of law or defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, except as we have specifically concluded above. In accordance with the magistrate's decision, the requested writ is denied.
Objection moot, objection overruled, and writ of mandamus denied.
 APPENDIX A MAGISTRATE'S DECISION Rendered on July 24, 2006 IN MANDAMUS {¶ 16} Relator, Reitter Stucco, Inc., has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission"), to vacate its order which granted an award of temporary total disability ("TTD") compensation to respondent Tony A. Mayle ("claimant") and ordering the commission to find that claimant is not entitled to that compensation due to claimant's violation of a written work rule and subsequent termination from employment.
Findings of Fact:
 {¶ 17} 1. Claimant sustained a work-related injury on August 4, 2003. Claimant presented at Riverside Methodist Hospital on August 4, 2003, and was diagnosed as having a lumbosacral strain.
 {¶ 18} 2. Claimant was seen by Wayne J. Cummings, D.O., on August 5, 2003. Dr. Cummings indicated that claimant would not be able to work for 72 hours, recommended rest, moist heat, ice, gentle stretching, and provided claimant with certain medications. Claimant was scheduled for reevaluation on August 8, 2003.
 {¶ 19} 3. Claimant was again seen by Dr. Cummings on August 8, 2003, and Dr. Cummings took claimant off work for the next seven days. Claimant was to return on August 15, 2003.
 {¶ 20} 4. Claimant returned and was again evaluated by Dr. Cummings on August 15, 2003. At that time, Dr. Cummings released claimant to return to work with restrictions which included no repetitive bending at greater than 45 degrees and no lifting more than ten pounds. Claimant was to return for reevaluation on August 22, 2003.
 {¶ 21} 5. Claimant was reevaluated on August 21, 2003, and Dr. Cummings indicated that claimant could continue working with restrictions of no repetitive bending at the waist, no lifting more than ten pounds and indicated that claimant should be permitted to take breaks as needed.
 {¶ 22} 6. Claimant was reevaluated on August 29, 2003. At that time, Dr. Cummings indicated that claimant could return to work without restrictions.
 {¶ 23} 7. Claimant returned to work; however, he reinjured his back.
 {¶ 24} 8. Claimant was reevaluated by Dr. Cummings on September 10, 2003, and Dr. Cummings indicated that claimant would be off work for the next seven days.
 {¶ 25} 9. An MRI was taken on September 11, 2003, which revealed the following results:
 1. Left posterolateral disc extrusion at L4-5 extending to the lateral recess at L5 and producing significant deformity of the left anterior aspect of the dural sac.
 2. Left posterolateral disc protrusion at L5-S1 producing moderate deviation of transiting left S1 nerve root.
 3. Moderate encroachment of the right L3-4 and L4-5 neural foramina.
Claimant continued to be treated by Dr. Cummings who opined that claimant continued to be unable to return to his employment
 {¶ 26} 10. During this time, relator elected to pay claimant wages in lieu of TTD compensation.
 {¶ 27} 11. Ultimately, claimant's claim was allowed for the following condition: "sprain lumbosacral; herniated disc L4-5; herniated disc L5-S1; lumbar degenerative disc disease L3-4 and L4-5."
 {¶ 28} 12. Dr. Cummings referred claimant to Dr. Gerard M. Papp for an orthopedic evaluation.
 {¶ 29} 13. In his October 9, 2003 report, Dr. Papp recommended that claimant have two to three caudal epidural steroid injections. If claimant failed to show significant improvement, Dr. Papp recommended microdiscectomy at L4-5 on the left and an expiration of L5-S1 on the left.
 {¶ 30} 14. The epidural injections were given to claimant at intervals of between three and four weeks and both Drs. Papp and Cummings continued claimant off work.
 {¶ 31} 15. Dr. Papp issued another report dated January 27, 2004, wherein he indicated that claimant's relief following the epidural injections was short-lived and that he continued to have significant pain. Dr. Papp concluded that the epidural injections had failed and he recommended that claimant have surgery.
 {¶ 32} 16. A C-9 dated January 29, 2004, and request for surgery was submitted to the employer, relator herein.
 {¶ 33} 17. On February 29, 2004, relator denied claimant's request for surgery on the basis that the request was not reasonably related to nor necessary for treatment of claimant's allowed conditions.
 {¶ 34} 18. A physician review was performed by Dr. Maria R. Coccia. In her April 1, 2004 report, Dr. Coccia opined that the MRI findings and the diagnosis of Dr. Papp were substantiated by her review of the records. As such, Dr. Coccia opined that there was a causal relationship between the conditions from which claimant was suffering and the injury.
 {¶ 35} 19. Dr. Steve McKee opined that the requested surgical procedure was reasonably related to the allowed condition and reasonably necessary for the treatment of the allowed condition and the employer approved the surgery on April 20, 2004.
 {¶ 36} 20. Surgery was actually performed on claimant on July 12, 2004, and claimant was discharged on July 14, 2004.
 {¶ 37} 21. Claimant was reevaluated by Dr. Papp on July 22, 2004. Dr. Papp opined that claimant would be off work for between eight and ten weeks as he progressed through physical therapy. Claimant began his physical therapy at Work Health.
 {¶ 38} 22. Claimant was seen by Dr. Papp on September 9, 2004. At that time, he was eight weeks post-surgery. Claimant indicated that he continued to have low back pain when doing dishes or running the vacuum cleaner, that his left foot gives out, and he has numbness along the lateral aspect of his left leg. Dr. Papp opined that claimant was not able to go back to work at that time.
 {¶ 39} 23. Claimant continued with his physical therapy and continued to be off work.
 {¶ 40} 24. On October 26, 2004, Jeanne Talbert, claimant's physical therapist, wrote a letter wherein she noted that claimant was having difficulty walking. In her letter, Ms. Talbert noted the following:
 * * * [Claimant] ambulated in extreme left sided supination that appeared to be related to lack of sensation and weakness in his left lower extremity. Tony Stated he did not ambulate like this prior to his surgery.
 In order to help correct this problem, we have been working on strengthening Tony's ankle eversion and dorsiflexion. Unfortunately, there has been little to no improvement in Tony's ability to voluntarily control his ankle and therefore his walking is quite abnormal. He now is complaining of left foot pain, most likely due to his awkward and abnormal gait pattern. Due to this pain and lack of ankle control, I am concerned that Tony may continue to develop other lower extremity problems that could impact his knees, hips and back if he continues to ambulate in this manner.
 I have requested a prescription from Tony's doctor for foot orthotics to help correct this increased supination. Dr. Papp has agreed with me that Tony would benefit from the use of orthotics and has provided a prescription for him to obtain them. Therefore, I am requesting that these orthotics be included in Tony's Worker's Compensation claim and thus a covered expense.
 I would like Tony to obtain his orthotics as soon as possible in order to incorporate their use in his therapy sessions. * * *
 {¶ 41} 25. In his October 28, 2004 report, Dr. Papp continued physical therapy for the next six weeks and indicated that claimant continued to be off work.
 {¶ 42} 26. Claimant was reevaluated by Dr. Papp on December 9, 2004. Dr. Papp noted that claimant continues to have low back pain which claimant rated at a seven on a scale of one to ten. Dr. Papp noted further as follows:
 He has been going to physical therapy. The physical therapist recommended a TNS unit. He has had about 25% to 50% relief of symptoms with the TNS unit. The physical therapist also feels he is making progress with his strength, gait and range of motion.
 At this point in time I would recommend that we continue physical therapy, also submit a C-9 for rental of a TNS unit.
 I really doubt he is going to be able to go back to the stucco type work. I would recommend vocational evaluation and beginning of a job search program.
 I will see him back in eight weeks time.
Claimant continued with his physical therapy and a work hardening program was requested and approved.
 {¶ 43} 27. On January 13, 2005, Dr. Terri Riddiford issued a report opining that the request for the left foot orthotic was reasonably necessary for the treatment of claimant's currently allowed conditions and was reasonably related to claimant's industrial injury. As such, Dr. Riddiford opined that the cost of the left foot orthotic was medically reasonable and relator subsequently approved.
 {¶ 44} 28. An occupation rehabilitation functional capacity evaluation was drawn up for claimant. Testing indicated that claimant's current physical capacities are in the medium strength level. A six-week program was recommended. Cathy Schaffer, the physical therapist who prepared the evaluation, noted the following: "Client's perceived ability may be more than his actual functional capacities."
 {¶ 45} 29. Claimant began his work conditioning program. Claimant attended all of his sessions and met the weekly goals as set for him by his therapist.
 {¶ 46} 30. Claimant was reevaluated by Dr. Papp on February 3, 2005. At that time, claimant was six and one-half months post-surgery. Dr. Papp noted that claimant had made considerable progress. Dr. Papp recommended that Dr. Cummings return claimant to work after he completes the work hardening program.
 {¶ 47} 31. Jeffrey R. Berman completed a vocational rehabilitation plan for claimant on February 14, 2005. Mr. Berman specifically noted that claimant was currently functioning at a medium strength level but that the employer had confirmed that claimant's job was in the heavy strength level. With regard to the issue of whether claimant would be able to return to his former job, Mr. Berman noted the following:
 The original employer was contacted to discuss return to work options. Fritz Reitter indicated Mr. Mayle would have to be released to return to work without restrictions in order to be considered for re-hire. Mr. Mayle could return to work as a mason or laborer depending on what was available at the time. He agreed to discuss this issue further once more information was known about Mr. Mayle's physical capabilities. Therefore, the initial vocational goal is to return to work in the same job with the same employer. Different job with the same employer is also a possibility.
 {¶ 48} 32. Claimant presented for physical therapy from February 22, 2005, and Dr. Cummings noted the following in claimant's record:
 * * * On today's visit, Tony is obviously very distressed and emotionally labile. He presents with his wife who did suffer a stroke few months ago. Tony has had increased stress due to this as he has been providing much of her daily care. Tony has been highly motivated throughout the recovery process following his surgery. He has pushed very hard and tried diligently to proceed in physical therapy so that he may return to work. Tony identified significantly with his place of employment as he has been working "since he was 12 years old." Last week, Tony was notified by his employer that he would not be offered a position back at Righter [sic] Stucco, Inc. Tony had conversation with a manager from his place of employment indicating that he was not going to be offered a position. Tony became extremely upset and indicates to me at this time that he thought that something had been reported from PT to his employer that caused Righter [sic] to not want him [to] come back to work. Tony in fact went to therapy and confronted several of the therapists there regarding this. It was at that time that I received a phone call from Greg Hendricks, therapist, indicating that Tony was very emotionally labile and tearful. Ultimately, we felt that Tony needed to be evaluated by NetCare Access and was in fact taken there for evaluation. Tony informs me today that he has been so focussed [sic] on his return to work that he has not been truthful regarding his pain level. Tony is informing me today that he in fact was not being truthful in reporting his pain level to either me or physical therapy. He states today that he does take two or three Percocet in the morning just to get out of bed. He states that his pain is severe much of the time and he has had persistent left leg pain since before the surgery. This condition was not resolved by his surgical procedure. He states that he cannot continue in therapy due to the pain. Tony is amenable to continuing therapy with NetCare Access and states that the [sic] does have a full intake session tomorrow at NetCare.
Dr. Cummings also requested a pain management consultation with Dr. Orvo.
 {¶ 49} 33. Claimant was seen at NetCare on the same day. The counselor noted the following relevant information:
 * * * Client has worked with Reitter Stucco for 18 years. * * *
 * * *
 * * * Client was married for 20 years and is separated. Wife had a stroke and although client is not living with her he is taking her to her medical appointments and helps her out. Client states that he has no children. Client is currently staying with a friend in Hilliard. Client states that he is not close to anyone, although he adds that "I still care for her." Client feels guilty because he feels like he caused his wife's stroke, because she [was] under stress when client was out of work due to injury.
* * *
 * * * Client is despondent and rates at "10" on scale of 1-10 and complains of "terrible nerves." Client took antidepressant but stopped due to cost. "I am sometimes [sic] afraid I might do something stupid." * * * Client is angry at employer. Client is depressed every day for past 2 years; lacks motivation; gained some weight recently; complains of insomnia every night; "has not slept more than an hour of [sic] two since Friday (3 days)"; psychomotor retardation; fatigue; loss of energy; feelings of worthlessness; hopelessness; significant difficulty concentrating (observed); anxiety and occasional panic episodes; thinks about dying "sometimes." Client reports some suicidal ideation without intent or plan; client reports some homicidal ideation against employer, without intent or plan. Client has taken antidepressants until 11/2004 when he could no longer afford them. Client has a history of learning disability. Prior to injury, client was with current employer 18 years. Client reports a past history of depression without treatment. In the opinion of this clinician, client meets DSM-IV TR criteria for Major Depressive Disorder Recurrent Severe without Psychotic Features. * * *
During his physical therapy visit and again when he saw the therapist at NetCare, claimant made the following type of statements:
 Client states that he would like to harm others and feels angry enough to "hurt my supervisors". I would rather hurt someone else before I hurt myself." "I would like pay back to them what they did to me, I've lost everything but the shirt off my back." Client states that he would not actually harm anyone even if he felt like it.
 {¶ 50} 34. Dr. Jay Davis, a NetCare physician, wrote a report dated February 23, 2005. In that report, Dr. Davis noted that claimant blames his employer for everything that has happened to him, including his wife's stroke. Claimant indicated that he feels he has been dealt with unjustly and admitted that he told the staff that he had thoughts of killing people at work and then killing himself. Dr. Davis specifically noted as follows: "He tells me today he would not kill them, that he was 'spouting off' because he had just learned about the job loss and he has since calmed down." He reported no history of violence.
 {¶ 51} 35. Sometime in March 2005, [Fritz] Reitter, president of relator, became aware of the comments that claimant had made during his therapy.
 {¶ 52} 36. On March 11, 2005, claimant saw Dr. Cummings who indicated that claimant would continue to be off work until he returned in two weeks.
 {¶ 53} 37. Claimant was seen by Dr. Michael Orzo, who recommended an EMG and opined that claimant may need selective nerve blocks.
 {¶ 54} 38. Claimant's vocational file was closed on April 8, 2005, because Dr. Cummings indicated that claimant was not medically stable to participate in services at this time.
 {¶ 55} 39. On April 11, 2005, [Fritz] Reitter called claimant and asked claimant to come see him. At that meeting, claimant admitted that he had made threatening statements related to his employer at his physical therapy session and relator terminated claimant's employment effective February 15, 2005.
 {¶ 56} 40. On February 20, 2005, Dr. Cummings noted that claimant was still unable to return to work.
 {¶ 57} 41. On April 25, 2005, relator approved the scheduling of an EMG for claimant.
 {¶ 58} 42. On April 26, 2005, relator requested TTD compensation supported by a C-84 signed by Dr. Cummings indicating that claimant was unable to return to his former position of employment.
 {¶ 59} 43. Claimant's motion was heard before a district hearing officer ("DHO") on June 7, 2005, and was denied. At the hearing, relator had argued that claimant was not entitled to any TTD compensation because claimant had voluntarily abandoned his former position of employment when he threatened to do bodily harm to his employer. Relator asserted that claimant had violated the following company policy: "Fighting, threatening or intimidating fellow associates or supervisors[.]" The DHO found that TTD compensation was not payable for the following reasons:
 * * * Temporary total disability compensation is barred based on a finding of voluntary abandonment. The claimant was terminated from employment on 4/15/2005 for violating a written work rule that (1) clearly defined the prohibited conduct, (2) had previously been identified by the employer as a dischargeable offense, and (3) was known or should have been know by the employee. State ex rel. Louisiana-Pacific Corp. v. Industrial Commission (1995) 72 OS3d 401.
 Specifically, the claimant threatened to kill Fritz Reitter, President of Reitter Stucco and Supply Co. Inc. The company handbook specifically indicates that threatening fellow associates or supervisors is grounds for immediate discharge. The claimant was provided with a copy of the handbook and all updates and should have been aware of this provision.
 {¶ 60} 44. Claimant appealed and the matter was heard before a staff hearing officer ("SHO") on August 11, 2005. The SHO vacated the prior DHO order in full and rejected relator's argument that the claimant had voluntarily abandoned his former position of employment as follows:
 The employer is requesting that inflammatory comments that the injured worker made while he was participating in vocational rehabilitation and receiving temporary total disability compensation, be found to meet the criteria for a Louisiana-Pacific termination.
 The facts indicate that the injured worker was in vocational rehabilitation, and made inflammatory comments to his counselor. That counselor took the injured worker to an Urgent Care, where the injured worker obtained his medication, which had been terminated, based on the employer's non-payment of the injured worker's medical insurance. That counselor then contacted the injured worker's employer, at which time the employer called the injured worker in, affirmed that those inflammatory comments had been made, and proceeded to terminate the injured worker on 04/15/2005 for violating a written work rule. The work rule enumerated was that of threatening fellow associates or supervisors. The employer terminated the injured worker on 04/15/2005. The employer requests that no temporary total disability compensation be paid beyond 04/15/2005.
 The Staff Hearing Officer finds that the injured worker was not capable of working and was on temporary total disability compensation when the inflammatory comments were made. Therefore, pursuant to State ex rel. Pretty Products (1996) 77 Ohio St.3d 5, the Staff Hearing Officer finds that the Louisiana-Pacific case does not apply.
Based upon the C-84s of Dr. Cummings, the SHO concluded that claimant's request for TTD compensation was granted.
 {¶ 61} 45. Relator appealed and the matter was heard before the commission on October 18, 2005. At that time, the commission affirmed the prior SHO order rejecting relator's argument that claimant had voluntarily abandoned his former position of employment by violating a written work rule as follows:
 The issue presented is whether the injured worker is entitled to receive temporary total disability compensation from 04/15/2005 to 06/20/2005 and to continue pursuant to the C-84 filed 04/26/2005. The employer argues that the injured worker is precluded from receiving such compensation pursuant to an application of State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401. The Commission rejects this argument for the reasons that follow and finds that the Staff Hearing Officer properly authorized temporary total disability compensation in the manner that she did.
 The Commission finds that the injured worker was off work for approximately 16 months and received wage continuation during this time. He also had undergone disc fusion surgery in July, 2004 followed by vocational rehabilitation. On 02/17/2005, the injured worker spoke with the employer about returning to his former position stating that he was ready to return to work. The employer informed him that he did not currently have an open position for the injured worker to return to and that he would need a medical release from injured worker's doctor for the injured worker to return to work without restrictions. On 02/22/2005, the injured worker was participating in rehabilitation and vented to his counselor that he was frustrated, that he would not be returning to the company or his job at all and that he wanted to kill himself, his wife and his employer. The rehabilitation counselor sought psychiatric assistance for the injured worker as a result of this episode and noted that the injured worker had not been taking his psychotropic medication for several months. It appears the employer became aware of the threats on or about 03/09/2005, when a rehabilitation report was faxed to Fritz Reitter. At a face-to-face meeting with the employer on 04/11/2005, the injured worker admitted that he had made threatening statements. On 04/15/2005 the employer fired the injured worker citing a violation of the employee handbook rule that prohibits fighting, threatening or intimidating fellow associates or supervisors. The employer argues temporary total disability after 04/15/2005 is barred on grounds that the injured worker voluntarily abandoned his employment con-sistent with Louisiana-Pacific.
 The Commission disagrees for two reasons. First, the Ohio Supreme Court in State ex rel. Brown v. Indus. Comm. (1993), 68 Ohio St.3d 45 has stated that ". . . a claimant can abandon a former position or remove himself or herself from the work force only if he or she has the physical capacity for employment at the time of the abandonment or removal." In this case, the injured worker was recovering from disc fusion surgery, and actively participating in rehabilitation. While it was clear that the injured worker deeply desired to return to work, it is equally clear that there was no medical evidence in the file releasing the injured worker to return to work without restrictions. The fact that the injured worker approached the employer on 02/17/2005 seeking his old job is not medical evidence that he in fact was physically capable of returning to work. Therefore, the injured worker did not have the physical capacity for employment at the time of his alleged abandon-ment.
 Second, when the injured worker discussed a return to work with the employer in February, 2005, the employer informed him that his old position had been filled and that currently, there was not position available to him. Clearly, the injured worker could not have abandoned a job that he did not have.
 For the foregoing reasons, the injured worker's termination does not preclude payment of temporary total disability compensation, as it does not amount to voluntary abandonment of his employment under Louisiana-Pacific.
 Accordingly, the Commission finds that the injured worker did not voluntarily abandon his employment and that the Staff Hearing Officer order of 08/11/2005 is affirmed.
 {¶ 62} 46. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law:
 {¶ 63} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond FoundryCo. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981),68 Ohio St.2d 165.
 {¶ 64} In this mandamus action, relator argues that the commission abused its discretion by awarding claimant TTD compensation in spite of the fact that claimant was terminated by relator after claimant violated a written work rule when he threatened to kill his employer. Relator contends that, under State ex rel. Louisiana-Pacific v. Indus.Comm. (1995), 72 Ohio St.3d 401, the commission should have found that claimant's actions violated a written work rule policy which was clearly defined, had been previously defined by relator as a dischargeable offense, and was known or should have been known to claimant. As such, relator contends that claimant voluntarily removed himself from the workforce and that it was his termination, not his industrial injury, which prohibited his return to work and caused him to have a loss of wages. For the reasons that follow, the magistrate disagrees with relator's argument and finds the commission did not abuse its discretion.
 {¶ 65} TTD compensation awarded pursuant to R.C. 4123.56 has always been defined as compensation for wages lost where a claimant's injury prevents a return to the former position of employment. State ex rel.Ramirez v. Indus. Comm. (1982), 69 Ohio St.2d 630. Where an employee's own actions, for reasons unrelated to the injury, preclude him or her from returning to their former position of employment, he or she is not entitled to TTD benefits, since it is the employee's own actions, rather than the injury, that preclude return to the former position. SeeState ex rel. Jones Laughlin Steel Corp. v. Indus. Comm. (1985), 29 Ohio App.3d 145. However, only a voluntary abandonment precludes a payment of TTD compensation. State ex rel. Rockwell Internatl. v. Indus.Comm. (1988), 40 Ohio St.3d 44. In State ex rel. Watts v. SchottensteinStores Corp. (1993), 68 Ohio St.3d 118, 121, the court stated as follows: "* * * firing can constitute a voluntary abandonment of the former position of employment. Although not generally consented to, discharge, like incarceration, is often a consequence of behavior that the claimant willingly undertook, and may thus take on a voluntary character."
 {¶ 66} In Louisiana-Pacific, the court characterized firing as "voluntary" where that firing is generated by the employee's violation of a written work rule or policy which: (1) clearly defined the prohibitive conduct; (2) had been previously identified by the employer as a dischargeable offense; and (3) was known or should have been known to the employee.
 {¶ 67} In the present case, the commission never addressed the issue of whether or not claimant's firing fell underLouisiana-Pacific such that it would preclude him from being paid TTD compensation. Instead, in its October 18, 2005 order, the commission relied upon the cases of State ex rel. Brown v. Indus. Comm. (1993),68 Ohio St.3d 45, and State ex rel. Pretty Products, Inc. v. Indus.Comm. (1996), 77 Ohio St.3d 5, wherein the Supreme Court of Ohio stated that a claimant can abandon a former position of employment or remove themselves from the workforce only if the employee has the physical capacity for employment at the time of the abandonment or removal. Because claimant had not been released to return to work, the commission concluded that claimant could not have voluntarily removed himself from a job which he (1) did not currently have, and (2) was not currently capable of performing.
 {¶ 68} Upon review of the record, the magistrate notes that, at no time, did claimant's treating physicians indicate that he was capable of returning to his former position of employment. Claimant was participating in rehabilitation at a medium strength level. According to Mr. Berman's conversations with the employer, relator herein, claimant's job required him to be able to work at the heavy strength level. As such, physically, all the medical evidence indicated that claimant could not return to his former position of employment. Furthermore, in December 2004, Dr. Papp indicated that he doubted that claimant would ever be able to return to his former position of employment and recommended vocational rehabilitation and the beginning of a job search for claimant. Clearly, claimant was not capable of returning to his former position of employment at the time that he made the comment to his therapist regarding his anger and the fact that he felt like killing his boss.
 {¶ 69} Counsel for relator argued before the magistrate that the facts of this case warrant an exception to the application of Brown andPretty Products. Relator argues that, in the present case, claimant was willing to immediately return to work in some capacity. However, due to his conduct threatening his employer, he was terminated. Relator asserts that, but for the conduct which led to his termination, he could be working.
 {¶ 70} The magistrate finds that the commission properly appliedBrown and Pretty Products and awarded claimant TTD compensation because he was not able to return to work at the time relator terminated his employment. [Text deleted.]
 {¶ 71} [Text deleted.]
 {¶ 72} [Text deleted.]
 {¶ 73} [Text deleted.]
 {¶ 74} Based on the foregoing, it is this magistrate's conclusion that relator has not demonstrated that the commission abused its discretion in determining that claimant could not have voluntarily abandoned his former position of employment when he allegedly violated a written work rule and was subsequently terminated. Because claimant was not capable of returning to his former position of employment at the time the comments were made to his therapist, no matter how relator later construed those comments, relator's decision to terminate claimant from employment because of the statements does not constitute a voluntary abandonment by claimant of his job and does not constitute grounds for denying him TTD compensation. As such, this court should reject relator's arguments and should deny relator's request for a writ of mandamus.